

**NUMBER 13-07-00145-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**SEVERINO DAVID VASQUEZ,**                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                **Appellee.**

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Vela
### Memorandum Opinion by Justice Rodriguez

Appellant, Severino David Vasquez, appeals from his murder conviction. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2003). By seven issues, Vasquez contends: (1) the trial court erred by limiting his voir dire examination of the jury panel; (2) the trial court erred in admitting evidence that he and the accomplice witness had visited an

attorney; (3) the testimony of the accomplice was not sufficiently corroborated; (4) the evidence was legally and factually insufficient to sustain his conviction; (5) the trial court erred by allowing his "mug shot" to be displayed to the jury; and (6) the trial court erred by allowing improper argument by the State. We affirm.

## I. BACKGROUND

The body of Maria del Carmen Vasquez was discovered in a deserted area in Sullivan City, Texas, on November 27, 2003. Vasquez, Maria's husband, was arrested for her murder. Yolanda Salinas, Vasquez's paramour, pleaded guilty to Maria's murder and testified against Vasquez for the State. A jury found Vasquez guilty of murder, and the trial court sentenced him to life imprisonment in the Texas Department of Criminal Justice-Institutional Division. This appeal ensued.

## II. COMMITMENT QUESTION

By his first issue, Vasquez contends that the trial court erred by limiting his voir dire examination of the jury panel. The State responds that the trial court, instead, properly precluded Vasquez from asking an improper commitment question. We agree with the State.

### A. Standard of Review and Applicable Law

The trial court has broad discretion over the process of jury selection and its discretion will not be disturbed absent an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited. *Id.*

A question that attempts to commit a juror to a particular verdict based on particular facts is a "commitment question." *See id.* These questions "commit a prospective juror

2

to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact." *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). A commitment question is proper if it leads to a valid challenge for cause and only includes those facts necessary to make the challenge for cause. *Id.* at 182. A question may lead to a valid challenge for cause under article 35.16(c)(2), if any venireperson "has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely. . . . " TEX. CODE CRIM. PROC. ANN. art. 35.16(c)(2) (Vernon 2006).

## B. Analysis

During voir dire, Vasquez attempted to ask the following question: "In a case there [sic] someone may be proved to be having a relationship with a—with another person, another woman or man. The fact—just the fact that the relationship exists would you believe that he's guilty of murder . . . ?" The trial court sustained the State's objection that this was an improper commitment question.

At trial, the State presented evidence of an extramarital affair to show Vasquez's motive for murdering his wife. Vasquez argues that the excluded question would have "shown if any juror believed that having a romantic affair with another woman would make a person more likely to murder his wife." Actually, the question asks whether the prospective jurors would resolve the issue of guilt against the defendant if the jurors learned a particular fact—that the defendant was having an extramarital affair. *See Standefer*, 59 S.W.3d at 179. More specifically, the question sought to determine whether a juror would automatically convict Vasquez because he was having an extramarital affair.

The question attempted to commit the potential jurors to a particular verdict based on a particular fact; thus, it was a commitment question. *See Barajas*, 93 S.W.3d at 38.

3

If the question would not have lead to a valid challenge for cause, the commitment question was improper. *Standefer*, 59 S.W.3d at 182. Although Vasquez contends that the excluded question would have led to a valid challenge for cause, he has not provided citation to authority or a clear and concise argument for this contention. *See* TEX. R. APP. P. 38.1(i). Moreover, because the law does not require a conviction on the basis that Vasquez was having an extramarital affair, the question went beyond asking whether jurors would be biased; therefore, the question was improper. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(c)(2); *Standefer*, 59 S.W.3d at 181 ("[W]here the law does not require the commitment, a commitment question is invariably improper."); *see also* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (setting out that a person commits the offense of murder if he "intentionally or knowingly" causes the death of an individual, or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of an individual). Under these circumstances, we conclude that the trial court did not abuse its discretion in sustaining the prosecutor's objection to this commitment question. *See Barajas*, 93 S.W.3d at 38. We overrule Vasquez's first issue.

### III. ATTORNEY TESTIMONY

By his second issue, Vasquez contends that the trial court erred in allowing Salinas's counsel, Roberto Jackson, Jr., to testify regarding Salinas's guilty plea.

A trial court's decision regarding the admissibility of evidence is reviewed for an abuse of discretion. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). We will uphold the trial court's decision if it is within the zone of reasonable disagreement. *Id.*

Vasquez argues that Jackson's testimony regarding Salinas's guilty plea implies that Vasquez is equally guilty, and that therefore "her testimony regarding the murder of Maria

4

del Carmen Vasquez is somehow corroborated." However, our review of the record reveals that it was not the State that elicited the complained-of testimony. During cross-examination, Vasquez asked, "And at one time did you advise her to plead guilty?" Jackson responded, "No. I advised her—I gave her options, the choice was made by her." Furthermore, Salinas had previously testified, without objection, that she pleaded guilty to the murder of Maria pursuant to a plea agreement. Therefore, error in the admission of Jackson's testimony that Salinas pleaded guilty, if any, was cured. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) (en banc) (providing that any error in the admission of evidence is cured when similar evidence is admitted without objection either before or after the complained-of-ruling); *Jaynes v. State*, 216 S.W.3d 839, 850 (Tex. App.–Corpus Christi 2006, no pet.) (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)).

Vasquez also complains that the trial court erred by admitting evidence that Vasquez and Salinas visited with Jackson "about a criminal matter during a relevant time period." Vasquez's argument appears to be that Jackson violated the attorney-client privilege by testifying that Vasquez and Salinas visited him. However, he does not provide authority, and we find none, to support a conclusion that an attorney's testimony that a defendant visited his office about a criminal matter reveals some confidential communication between counsel and client. *See Austin v. State*, 934 S.W.2d 672, 674 (Tex. Crim. App. 1996) (en banc) (providing that a client bears the burden of establishing the existence of the attorney-client privilege). Jackson's testimony only revealed the purpose for which he had allegedly been engaged, which is a non-confidential matter that the attorney-client privilege does not encompass. *See Duval County Ranch Co. v. Alamo*

5

*Lumber Co.*, 663 S.W.2d 627, 634 (Tex. App.–Amarillo 1983, writ ref'd n.r.e.) (". . . [T]he attorney-client privilege does not encompass such nonconfidential matters as . . . the purpose for which an attorney has been engaged, or any of the other external trappings of the relationship between the parties.").

Moreover, Salinas testified without objection that after Vasquez spoke to Lieutenant Homero Alafa about the murder of Maria, he went with her to visit Jackson. Salinas stated that they visited Jackson together because she believed that he was going to represent both of them. According to Salinas, Jackson subsequently informed her that he could not represent Vasquez because there was a conflict. Therefore, error, if any, in admitting Jackson's testimony that Vasquez visited him concerning a criminal matter was cured when the same evidence was admitted through Salinas's testimony. *See Ethington*, 819 S.W.2d at 858; *see Jaynes*, 216 S.W.3d at 850. We overrule Vasquez's second issue.

## IV. CORROBORATING TESTIMONY

In his third issue, Vasquez complains that Salinas's testimony was not sufficiently corroborated.

A person cannot be convicted based upon the testimony of an accomplice unless that testimony is "corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). It is not necessary for the corroborating evidence to be sufficient in itself to establish guilt beyond a reasonable doubt. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (en banc). The non-accomplice evidence does not have to link the accused directly to the commission of the offense. *Id.* However, there must be some non-accomplice evidence that tends to connect the accused to the commission of the offense. *Id.* Both direct and circumstantial

6

evidence may furnish the necessary corroboration. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) (en banc). "Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony." *Id.*

## A. Accomplice Testimony

Salinas met Vasquez at his place of employment in September 2001, and they began having an affair in September 2002. In July 2003, Maria began calling Salinas to learn more about Salinas's relationship with Vasquez. Salinas told Maria that they were only friends. In October 2003, Maria slashed one of the tires on Vasquez's truck. After Vasquez fixed the tire, he went to work and then spent the night at Salinas's apartment. When Salinas and Vasquez awoke the next morning, Vasquez's truck was gone.

On November 21, 2003, Vasquez called Salinas at about 11:00 a.m. and told her he was going to her apartment. He arrived with Maria and told Salinas that he and Maria were reconciling. Maria asked Salinas for the wedding ring that Vasquez had given Salinas. Salinas stated that she would return it if Maria returned a ring Salinas had given Vasquez. Maria claimed that she had pawned it.

Salinas testified that Vasquez sat on the sofa with his hands in his pockets and that she could see his hands moving. Salinas was afraid that Vasquez and Maria were going to harm her. Vasquez suddenly stood up and kissed Maria. Vasquez then removed a cord from his pocket and placed it around Maria's neck. Maria said, "[D]on't do it, David, don't do it for your son." Vasquez applied pressure to Maria's neck and, when the cord started slipping from Vasquez's grip, he asked Salinas for help. Vasquez then grabbed a power strip and used it to "finish her off." Maria's face got very dark, and a small amount of blood dripped from her neck. While Vasquez strangled Maria, Salinas stood there shaking and

7

could not move.  After murdering Maria, Vasquez cut off a piece of the sofa that had blood on it and put it in a plastic bag.

Vasquez then checked to see if Maria was dead, laughed, and removed her jewelry. He told Salinas that she was next, slapped her twice, and told her to help him cover the body and get it outside.  Salinas helped Vasquez carry the body and place it in the trunk of her car.  Vasquez spent a few minutes cleaning up the scene, while Salinas watched and cried.

When he finished with the cleaning, Vasquez grabbed Salinas by the arm and told her that they were going to drop the body off somewhere.  They drove in Salinas's car to a dirt road in Sullivan City where a white car was waiting.  While Salinas sat in her car, Vasquez and a man who exited the white car took Maria's body out of the trunk.  After they disposed of Maria's body, Vasquez cleaned Salinas's trunk, and they drove back to her apartment.  Vasquez told Salinas to give her living room set to a family member.  Salinas spoke to Vasquez several times that afternoon.

The following morning, Salinas's sister, Rosa Salinas, picked up the furniture. Maria's sister, Bertha Isabel Lane (Betty), also went by Salinas's apartment that morning looking for Maria.  Later, Vasquez went by and told Salinas to tell the police that they were at her apartment that day and that, because she was not feeling well, they went to Mexico to get medicine.  Salinas testified that on the day police discovered Maria's remains, she asked Vasquez why he had killed Maria in Salinas's apartment and he replied that if he had known she was such a "scaredy [sic] cat," he would have done it somewhere else.

Salinas saw Vasquez every day between November 21 and December 12, 2003, and continued to have a sexual relationship with him.  During one encounter, Salinas left

8

several "hickies" on Vasquez's body. Pictures of red marks on various parts of Vasquez's body were introduced into evidence.

### B. Non-Accomplice Evidence

Because Salinas pleaded guilty to Maria's murder, her testimony is accomplice-witness testimony. The State was thus required, pursuant to article 38.44 of the Texas Code of Criminal Procedure, to present non-accomplice evidence tending to connect Vasquez to the crime. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14.

The State presented the testimony of several witnesses to establish that Vasquez was with Salinas on or about 11:00 a.m. on November 21, the time Salinas claimed Maria was murdered. "Although the presence of the accused in the company of the accomplice, near the time of the offense, while alone is not conclusive[,] it nevertheless is an important factor in determining corroboration." *Jackson v. State*, 745 S.W.2d 4, 13 (Tex. Crim. App. 1988) (en banc).

Lieutenant Alafa testified that Vasquez told him that he had gone to Salinas's apartment on November 21, at approximately 11:00 a.m., and that he was with her until approximately 2:20 p.m. Vasquez also told Lieutenant Alafa that he and Salinas traveled out of town in her vehicle and then returned to her apartment during that time period.

Maria's sister, Lane, testified that she and Maria spoke to each other several times daily. According to Lane, she last spoke to Maria on November 21, at 10:30 a.m., while Maria was shopping at Foley's. Maria ended the call by telling Lane that she would call her back, but Lane never heard from Maria again. Phone records revealed that Vasquez was the last person Maria spoke to on November 21. Lane also testified that on November 22, she and her husband went to Salinas's apartment because they were worried about Maria.

9

When they arrived, someone was mopping the living room floor and Salinas's living room furniture was being loaded onto a truck.

The State also presented evidence of other suspicious circumstances. *See Reed*, 744 S.W.2d at 127 (providing that evidence that the accused was at or near the scene of the crime at or about the time of its commission, coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction). DNA evidence established that Maria's remains had been in the trunk of Salinas's vehicle. Maria's permanent resident alien card and Texas driver's license were found in Vasquez's possession. Lane testified that Maria never left home without those documents because she traveled across the border to Mexico several times a week. Jose Ovalle, Jr., senior special agent with the "Department of Homeland Security-Immigration, Customs Enforcement," stated that the resident alien card recovered was authentic and current and that no duplicate cards had ever been requested. According to Ovalle, a resident alien card is required to re-enter the United States from Mexico.

The State also presented evidence that Vasquez and Salinas were having an extramarital affair. Although proof of motive is not a required element in criminal cases, motive is relevant as a circumstance tending to prove the commission of an offense. *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982) (en banc); *see Reed*, 744 S.W.2d at 127 (stating that although alone, evidence of motive is insufficient as corroboration, it may "be considered in connection with other evidence tending to connect the accused with the crime"). Vasquez admitted to Lieutenant Alafa that he was having an affair with Salinas. Furthermore, during the search of Salinas's apartment, police recovered evidence

10

of the affair including: (1) two pictures of Vasquez; (2) a pair of thong underwear with the inscriptions, "Babe, I love you with all my heart and soul. Love David." and " Love and kisses"; and (3) forensic samples taken from a mattress in Salinas's home containing a mixture of Salinas's and Vasquez's DNA. Testimony revealed that Maria and Vasquez had argued about his relationship with Salinas and that they had slashed each other's tires after arguing about the affair. Rebecca Olivares, the "clerk register" of Maria's son's school, testified that Maria wanted to know the procedure for withdrawing her son because Vasquez told Maria she had to leave to Mexico without her son. Olivares stated that Maria did not want to leave without her son.

Finally, the State presented evidence that Vasquez's behavior was suspicious after Maria's disappearance. On November 24, 2003, Vasquez reported to John Terry, his insurance agent, that Maria's car was stolen. Terry testified that Vasquez insisted that Terry backdate his missing vehicle report to state that the car had been stolen "a couple days prior" to November 24. Terry had never had a customer request that a report be backdated. Upon learning that Maria was missing, he asked Vasquez whether she had the car and Vasquez replied that he did not know. Vasquez insisted that Terry file the claim. Terry stated, "[I]t just seemed to me he didn't seem to act like someone who's wife was missing. . . . [I]f [your wife has] suddenly disappear[ed], I would expect someone to be distraught . . . And he just wasn't."

Francisco Guerrero, an officer who informed Vasquez that his wife was deceased, testified that Vasquez showed no emotion and was non-responsive at the news that his wife had been found burned and dismembered. Guerrero found Vasquez's response to

11

this news so unusual that it prompted him to ask Vasquez if he understood what he had just been told.

Finally, Sergeant Morales testified that Vasquez told him that Maria had taken a check in the amount of $7,000 with her and that he subsequently closed their bank accounts because he feared Maria would withdraw more money from them. Phone records revealed that Vasquez called Salinas approximately two hundred times at different hours of the day and night between November 22 and December 11, 2003.

While the foregoing circumstances individually may not each be sufficient to corroborate the accomplice testimony, we conclude that, taken together, rational jurors could conclude that this evidence sufficiently tends to connect Vasquez to the offense. *See Cox v. State*, 830 S.W.2d 609, 612 (Tex. Crim. App. 1992) (en banc) (concluding that evidence of other suspicious circumstances filled the sufficiency gap left by evidence of appellant's mere presence at scene of offense); *Paulus v. State*, 633 S.W.2d 827, 846 (Tex. Crim. App. 1981) (en banc) (noting that evidence showing motive or opportunity can be considered in connection with other evidence tending to connect the accused with the crime). Accordingly, we overrule Vasquez's third issue.

## V. SUFFICIENCY OF THE EVIDENCE

By his fourth and fifth issues, Vasquez contends that the evidence is legally and factually insufficient to sustain his conviction. Specifically, by his fourth issue, Vasquez argues that "[t]he myriad of evidence brought by the State did not tie [him] to the murder." In his fifth issue, Vasquez argues that the verdict in this case is clearly wrong and manifestly unjust because the evidence did not tie him to the murder.

12

## A. Standard of Review

In conducting a legal sufficiency review, we view the relevant evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, Vasquez committed the offense of murder if he "intentionally or knowingly" caused the death of Maria, or intended to cause her serious bodily injury and committed an act clearly dangerous to human life that caused

her death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). A person acts "intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective to engage in that conduct or cause the result." *Id.* § 6.03(a) (Vernon 2003).

## B.  Analysis

To support his contention that the evidence is legally insufficient, Vasquez points to the following:  (1) there was no blood found on his white "Dickies" jacket; (2) the DNA evidence from a cigarette found near the area where Maria's remains were discovered did not match Vasquez's DNA; and (3) white pieces of fiberglass found near Maria's body did not come from his truck.  In support of his factual sufficiency challenge, Vasquez argues that the following facts do not lead to a rational conclusion that he killed Maria:  (1) he had an affair; (2) he claimed that his adopted son was his biological son; and (3) Maria had a life insurance policy.

Vasquez appears to be arguing that there is no direct physical evidence proving he committed the murder.  However, as stated above, the State established through Salinas's testimony that on November 21, 2003, Vasquez intentionally caused Maria's death by wrapping a cord around her neck and strangling her.  *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) (en banc) (noting that in evaluating the legal sufficiency of evidence of guilt, we must consider all of the evidence including accomplice-witness testimony).  Additionally, the non-accomplice evidence  corroborates Salinas's testimony. The jury had the opportunity to observe and evaluate the witnesses' credibility and demeanor and to weigh the evidence presented to them by the State.  *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000).  The jury chose to believe Salinas's

14

testimony that Vasquez murdered Maria. Therefore, viewing the evidence in a neutral light and giving due deference to the jury's determination of the weight to be given the evidence, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Hooper*, 214 S.W.3d at 13; *Escamilla*, 143 S.W.3d at 817. Thus, the evidence is legally sufficient to support the verdict. Furthermore, having reviewed the entire record, we cannot say that the evidence is so weak that the jury's determination was clearly wrong or that conflicting evidence so greatly outweighed the evidence supporting the conviction that the jury's determination was manifestly unjust. *See Watson*, 204 S.W.3d at 414-15, 417; *Johnson*, 23 S.W.3d at 11. Thus, the evidence is factually sufficient. We overrule Vasquez's fourth and fifth issues.

## VI. ADMISSION OF PHOTOGRAPHS INTO EVIDENCE

By his sixth issue, Vasquez contends that the trial court reversibly erred by admitting into evidence State's exhibit 198, a picture Vasquez describes as his "mug shot." Vasquez argues that there was no justification to show the picture and that it served only one purpose: "to inflame the jury and prejudice the Defendant [Vasquez]."

The complained-of picture shows the head and shoulders of a shirtless Vasquez with red marks on his shoulder, arm, and upper chest. In the picture, Vasquez is standing in front of a light background with height measurement markers behind him. There are no police identification markings in the picture. The picture was admitted through Sergeant Lara's testimony, when he testified that the marks appeared to be "hickies." The picture was offered to support Salinas's testimony that she had continued having sex with Vasquez after Maria's death. Vasquez objected to the admission of the photograph on the basis that its prejudicial value outweighed any probative effect. *See* TEX. R. EVID. 403.

15

Mug shots are often found to be inadmissible when they are obtained from a previous arrest and show the commission of an extraneous offense, potentially infringing on a defendant's fundamental right to the presumption of innocence. *See, e.g., Richardson v. State*, 536 S.W.2d 221, 223 (Tex. Crim. App. 1976) (concluding that appellant's mug shot showing the police department's identification marker "tended to show the commission of an extraneous offense and, therefore, [infringed on] appellant's fundamental right to the presumption of innocence"); *Alexander v. State*, 88 S.W.3d 772, 780-81 (Tex. App.–Corpus Christi 2002, pet. ref'd) (holding that a mug shot of appellant showing that he had previously been arrested was improperly admitted). However, Vasquez does not allege the photo was taken for a previous offense. In addition, prior to the photo being admitted, testimony revealed that Vasquez had been taken into custody on the day the photo was taken. *See Reyes v. State*, 579 S.W.2d 927, 928 (Tex. Crim. App. 1979) (providing that the complained-of photograph was taken of appellant as a result of his being arrested for the present offense and in no way suggested that appellant had had previous encounters with the police); *Ware v. State*, 628 S.W.2d 249, 251 (Tex. App.–Fort Worth 1982, pet. ref'd) (noting that evidence of the time a defendant had been booked in conjunction with a corresponding date on the mug shot "vitiated the introduction of extraneous offenses"). Vasquez even concedes that it was taken while in police custody for the present offense. Moreover, the picture contains no overt markings specifically identifying it as a "mug shot," such as a chest plate depicting the name of the police department or case number. *See Reyes*, 579 S.W.2d at 928 (providing that the preferred practice in admitting "mug shots" is to remove the police identification marks before the photograph is introduced to the jury); *Huerta v. State*, 390 S.W.2d 770, 772 (Tex. Crim.

16

App. 1965) (concluding that the trial court did not err in admitting a picture of appellant because "[a]ll identification marks were removed, and, as far as the jury was able to determine, it might have been taken in a penny arcade"). Under these circumstances, we conclude that the trial court did not abuse its discretion in admitting the complained-of picture.

Vasquez next argues that when the photograph "was left on the over-head projector for a time" he was "further damage[d] and prejudiced" because "the purpose of entering these photographs was clearly to imply that the Defendant [Vasquez] visited a lawyer because he was guilty." Vasquez's argument is based on the premise that the photograph was admitted into evidence when attorney Jackson testified. However, the record shows that the complained-of picture was admitted through Sergeant Lara's testimony. Therefore, we are not persuaded by Vasquez's argument. Vasquez also complains that the trial court erred in admitting several other pictures of him into evidence. However, at trial, Vasquez only objected to State's exhibit 198. Therefore, Vasquez has not preserved error regarding the other exhibits. *See* TEX. R. APP. P. 33.1. We overrule Vasquez's sixth issue.

## VII. JURY ARGUMENT

By his seventh issue, Vasquez contends that the trial court committed error by allowing the State to rely on evidence outside the record during its closing argument. However, Vasquez did not object to the prosecutor's argument and therefore failed to preserve error. *See Mathis v. State*, 67 S.W.3d 918, 927 (Tex. Crim. App. 2002) (concluding that appellant forfeited right to complain on appeal concerning the State's improper jury argument by failing to object at trial); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (en banc) ("Before a defendant will be permitted to complain on

17

appeal about an erroneous jury argument or that an instruction to disregard could not have cured an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling.").  We overrule Vasquez's seventh issue.

## VIII. CONCLUSION

We affirm the trial court's judgment.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 22nd day of January, 2009.